Your Honor, the first case of the morning is called 213-0244 G.I.S. Venture at Paul v. Novak and various school districts. On behalf of the Appellant, Mr. Evan G. Carnes II. On behalf of the school districts, Mr. Ariz D. Daliatis. Mr. Carnes, you may proceed. Good morning, Justices, Counsel. With me today also is Mr. Powers in my office and Mr. Rooney, who argued this case the last time it was before the Court. This matter arose originally as a result of a series of objections by a Taxpayers' Council beginning in the late 90s and continuing through the present. Nothing has changed. The school districts continue to transfer funds, illegally diverting them from working cash into either operations and maintenance or one of the other building-related funds. At the time that the initial matter occurred, the diversion was from working cash to operations and maintenance, largely across all districts. When you say there's no dispositive issue, is that because of the hypothetical nature of the ruling? Is that what your argument is? Yes, not only because of the hypothetical nature, Your Honor, but also as well because the districts had all previously stipulated that these transfers were permanent and that they were abatements and not abolishments. The remand from this Court remanded for actions consistent with the opinion and a determination of whether if an abolishment had occurred and the money was properly transferred to education, then there would have been an excess accumulation. But by stipulating that there was no abolishment, they could never meet their threshold. We argued this to the Court several times over the period of the prior couple of years, and yet the Court, for lack of a better term, shall I say, was seduced by an opportunity to perhaps get rid of the case when the Council for the Taxing Districts identified what they called a road map. And their version was that this was a road map from the appellate court, which was to identify the abolishment. By the time they identified that and began to argue that, they had already stipulated and judicially admitted that there was no abolishment. If you can't establish the abolishment, you can't very well say that that's the road map that this appellate court sent back. In our earlier opinion, didn't we talk about abatement or abolishment? Yes, Your Honor. The earlier opinion talked both about abatement and abolishment. The remand itself, however, specifically remanded for actions consistent with the opinion, which we told the Court meant that you should take a look at the other matters that this Court addressed. And we specifically asked that the trial court enter findings consistent with this Court's opinion, granting a summary judgment, finding the liability, and proceeding on to address the issue of how we received damages. The Court rejected all those at the request of the Taxing District, saying that since this Court had already made those findings in its opinion, there was no need for that trial court to actually address those issues. At that juncture, and to be fair to the trial court, Mr. Justice, this case has had several different trial judges. So Judge Fulton was coming on in the middle of the matter having been remanded from this Court, following Judge Dudgen's several different addressing of a number of different motions. And perhaps the idea of dealing with everything simply in one fell swoop was seductive. Didn't the prior disposition indicate that the trial court was to consider whether or not, if the monies had been placed in the proper place in the appropriate way, would it have created an improper excess accumulation, such that you'd be entitled to financial relief or refund of a portion, depending on what the facts establish regarding an excessive accumulation? Yes, Your Honor. It was your opinion, Justice McClaren. We believe that that's exactly one of the issues that the opinion addressed. But the opinion, as it was written, said to determine if there was an abolishment if the money had been properly placed in the educational fund. As we argued with respect to the 304A motion, Judge, or certification, Mr. Justice, they could not meet the standard that 304A was improper because it didn't resolve all the remaining issues with respect to working cash, even if the trial court followed this Court's direction to determine whether an abolishment had occurred under the hypothetical that this Court directed at the time. The problem was there's a hypothetical upon a hypothetical. While this Court said go back and determine X, by the time X was to be determined, as I said earlier in response to Justice Burke's question, the districts had already stipulated that this was, in their mind, specifically an abatement and not an abolishment. Now, we can only speculate why that would be, but most likely it's because they don't want to go back to a referendum to recreate a working cash fund in this environment. The issue, nevertheless, Your Honors, was that at the time that this matter was set up, taxing districts requested the right to file this motion, follow this perceived roadmap, and lead the Court to a conclusion that couldn't be reached because of the fact that they already stipulated it was an abatement and not an abolishment. Therefore, even if the entire intent of this Court was to determine that, they stipulated themselves out of it or judicially admitted themselves out of the ability to file that. Our position remains that our original, and I apologize, this was filed by predecessor counsel, Mr. Jim Garrity, and prosecuted for a number of years by Mr. Rooney, who's here with us today, and my office took over the prosecution just about the time that this issue of the perceived roadmap arose. So we continue to argue, as did Mr. Rooney before us, and as did Mr. Garrity briefly, that this is an issue of illegal diversion. The Supreme Court has addressed illegal diversion numerous times. Now, in the past, typically the illegal diversion cases have dealt with an excess accumulation, and so perhaps it was this Court's intent to address that as well. Whether it was this Court's intent to address that or focus solely on that, the illegal diversion cases that the Supreme Court has addressed, which include both Myers and its predecessor Harding in 53 and 52 respectively, specifically found that where an illegal diversion occurs, the remedy to the taxpayers is upholding their objection, number one, and number two, the return of the money to the appropriate fund. There was no statutory right at any time. Since Meyer, we have Miller, where the Supreme Court has spoken on how do we determine when there's an excess accumulation. I agree that that's correct. I don't agree, Judge, that that's the issue that the taxpayers' pleadings ever framed, nor is it an issue that the taxing districts have ever addressed in terms of our pleadings. So your argument is any accumulation is illegal and there should be some remedy. No, Justice Burke, I understand the Miller case. I'm arguing that this is not an excess accumulation argument. They want it to be because no one in their right mind would ever be able to file an objection and uphold an objection in an excess accumulation for an Ed Fund because the Ed Funds are so gigantic. So they want you to be able to say, yes, it's okay to hypothetically assume that we didn't do any of these illegal things, that we didn't illegally divert money over the years from these funds and continue to do so today. Yes, we want you to say we can do a do-over and we can correct what should have been done by moving this money to the Ed Fund. They didn't do that. They haven't done it. They didn't return after this Court ruled and put any money back in the Ed Fund. They did, after five years or four and a half years of arguing about what this Court intended with Mr. Rooney, they did finally say, well, you know what, let's go back to scratch. Let's go back and say we want to prove that there was an abolishment. It was too late. They'd already stipulated there was an abatement, which is why when the motion was filed over our objection and over our direction to the Court that this would not resolve the case, which was why when we looked at it, it was clear that the numbers did not create an excess accumulation. There was no point in arguing about whether excess accumulation occurred. It wasn't the relief that we sought, nor was it the illegality that we alleged in our pleadings. Why do you want to send it back? I'm not quite sure I understand. What other facts have to be determined or found at the trial court level in order to render judgment in your favor? Justice McGlarney, you have an excellent point. It doesn't need to go back. This Court can grant all the relief we request. This Court can find, as it found in G.I.S. 1, that the actions were illegal. This Court can find, as the districts have now stipulated and admitted, that these were abatements which were not permitted by the statutory authority at the time. And this Court can also find, based on the pleadings and record, the amount that's at issue and the award in each one of these districts for each one of these years. Because in the process of setting up a table to establish what percentages or ratios existed, they had to set up the amount of money that you claim was illegally diverted. Yes. Not only that, Judge, the pleadings of the original tax complaints in each year established the amount that was diverted, and there's never been any objection to that number. That's on record in the annual financial reports of the individual districts and in their budgets. So, yes, Your Honor is correct. This Court can grant all the relief that we requested. We'll just find that the trial court erred. In our earlier case, didn't we indicate that even if we call it an abatement, the money should have gone to the education fund but not the O&M fund? Absolutely, Judge. Mr. Justice, you're correct. The money should never have gone anywhere other than the education fund at any relevant time to our objections. And that's part of the issue here. Under Harding... But is your argument that since there was no abatement authorized by statute, then any diversion of these funds to any fund was improper, was illegal, and subject to return of some of the tax money? Yes, with the sole exception that I think you made a minute ago, Justice Burke, that it could have been abated to the education fund. The education fund, by statute, was entitled to receive any transfers from the working cash fund. The working cash fund is created largely to deal with the possibility that tax collections or funding on a cash basis may not rise to the needs of the district, and therefore the district can move that money to the education fund to pay its bills. What it's not allowed to do is move the money willy-nilly and divert it illegally to other funds, and that's exactly what happened in Harding and Myers. It's exactly what the Supreme Court addressed, what they condemned, what this Court condemned in G.I.S. 1. It was a diversion to a fund that had no statutory basis to receive it and no common law basis to receive it as well. There was a stipulation that these were permanent transfers, which is exactly what Harding and Myers dealt with. And contrary to intervening districts' response brief, where they argue that in other instances the courts had ruled that it was okay and that there was no damage to the taxpayers, in Gilbert, for instance, in People X.R.L. Brenza v. Gilbert, in People X.R.L. Redfern v. Penn Central, and in People X.R.L. Pucharski v. McGovern, in each of those instances there was either a plan in place to return the money, the money was already budgeted to be repaid and was booked solely as a loan on the books of the district, or in a final instance, the money went to something that was not technically permitted, the creation of a golf course and maintenance of sand traps and fairways, as opposed to woodlands, which it was supposed to be for as a forest preserve function. But the court observed that in so doing, they created an additional revenue stream, and so therefore the expenditure of the money was offset by the revenue stream. None of that appears here. These were specific, defined, illegal diversions with the sole intent to never be repaid. In essence, what happens is they levied to the max of whatever the fund was and turned around and then took the money that they levied in working cash and transferred it to increase the money that they had in operations and maintenance or a building. Is there a distinction with a difference between abatement and abolishment? Mr. Justice McLaren, you pose the million-dollar issue, I think, for the Supreme Court. The court, the legislature used two different terms. Mr. Rooney tried to convince this court previously in GIS 1 that if you compared the language to, for instance, the park district enabling statutes, they meant the same thing. This court rejected that on the argument of intervening district counsel, that they had to mean something different, and certainly rudimentary legislation, rudimentary judicial interpretation of legislation requires you to use the normal terms and definition of the words. Therefore, you found that abatement must be something different than abolishment, and in the Walking Back case that the Supreme Court addressed, they addressed abatement separately, and therefore the problem is the legislature has never defined it and the Supreme Court hasn't defined it. So it must be something different than abolishment. It must be something less than an abolishment. But what it doesn't necessarily mean is it can be a permanent transfer. And the issue here is perhaps the court, the Supreme Court, might recognize that these illegal diversions could have been okay if there was some need, if there was some need to borrow and to pay back. These districts never intended to pay back. They specifically have admitted that these were permanent and ongoing transfers. To this day, they continue to permanently abate on an annual basis. I guess what I was attempting to elicit was a response, something to the effect that regardless of whether it was an abatement or an abolishment, since it was an illegal diversion, the issue of improper accumulation is immaterial. Now, would you like to comment on whether or not abatement versus abolishment is material when it comes to determining if an illegal diversion or excessive accumulation has taken place such that in one instance of abatement, you would get a certain result, but with an abolishment, you would get a different result? I'd love to comment, Justice McClaren. I want to make sure I understand the question. If the statute clearly addresses that if a district abolishes, perfectly okay to abolish. The funds have to go to the Ed Fund. The loans, to the extent loans were made, have to be repaid to the Ed Fund. Instance of abatement. Abatement, to the extent it was statutorily permitted, had to be to the Ed Fund. It wasn't. So to the extent that there's a question of excess accumulation, it doesn't really arise in a situation of abatement. The point that I'm getting at is if it's an abolishment, as you said, it's supposed to go to the Ed Fund. But did it go to the Ed Fund? Did it go someplace else upon abolishment? In no instance did any of this money go to the Ed Fund, ever. And all of these were, as I've said a couple of times, I hate to beat the horse in the glue, but abatement, was permanent transfers with no intention to be repaid. Did it result in an excess accumulation in the O&M Fund? That's a good question, Justice Burke. No one's ever addressed that. I can't answer it. I'm sorry. Is the question more properly asked, did it ever create an excess accumulation in the Ed Fund? If the question was asked that way, Mr. Justice McLaren, we've stipulated that if that money would have been transferred under the hypothetical, it would not have created an excess under the Miller case. I'm not asking Justice Burke to explain this question, but the way I understood it, you're taking monies out of the Working Cash Fund, so therefore whether or not there was an excess accumulation in the Working Cash Fund can't happen. Unless you're possibly talking about monies that were taken out of the fund and placed someplace else were then returned, and would that have created something over a period of time other than, say, one taxing cycle, an excess accumulation in the Working Cash Fund? If I address myself to your question, Justice McLaren, with respect to Working Cash, excess accumulation analysis does not work for Working Cash. Working Cash doesn't have annual expenditures on a budgetary basis that you can identify for the prior three years as the Supreme Court has adopted in Miller. And is the Working Cash Fund supposed to relate to only matters regarding the delay in the tax collection cycle, where I think you mentioned something about a cash basis? Our understanding from the case law and the statute says, and the Illinois State Board of Education manuals and regulations is, Working Cash provides, I hate to use the term slush, but Working Cash provides a reserve, so that if a district has a shortfall in its collections, if a district, for instance, I understand in Lake County, Waukegan is having a massive reduction of its overall equalized assessed value, some of their districts are facing the fact that their budgets now have a huge shortfall. Working Cash, theoretically, to the extent that money exists, would be able to fill that shortfall. Does that answer your question, Mr. Justice? Well, not to a certain extent, but I have enough knowledge or experience in the area to know that sometimes what you budget isn't what you appropriate. Yes, that's true. Even after the fact legislation has been passed to validate such transactions. Yes, Mr. Justice, we believe you're right. Are there any other questions? If I do, you have an opportunity to make rebuttal. Thank you, Your Honor. Panel. Oh, I'm sorry. I said something. It's okay. We should be reading this. May it please the Court of Counsel, good morning, Justices. My name is Eris Deleonis. I'm arguing on behalf of the DuPage County Collector and the 17 school districts that have intervened in these matters for the 54 objections for the years 1998 through 2010. This matter, as you know, is before the Court for the second time now. It was remanded with specific instructions, what Judge Fullerton and the parties have referred to as a road map, directing the trial court to make a determination as to whether there would be any, quote, were put in as part of the beginning balance for the educational funds. And keep in mind that these objections are specifically addressed to the educational funds of these districts. The language of the objections is virtually identical for each of the years at issue, for all 54 objections for each of the school districts. It objects to the levy being excessive and the educational fund. And this Court... Which is why we never got to whether the O&M fund had an excess accumulation. That's right. Because the complaints were tied to the educational fund. They were directed at the educational fund. And this Court said, do that excess accumulation analysis. The law has been settled for decades on what the excess accumulation analysis is. Take the beginning balance, add in the monies that are coming in the door during that fiscal year. That sum then should be divided either by the actual expenditures from the prior year or the three-year average expenditures for the three prior years. And so that was done in this case. The comprehensive annual financial reports were provided. The board resolutions for each of the school districts were provided. The affidavits of knowledgeable people at the school districts were provided. And in every instance, what came out is that there's nothing even close to the bottom end of the range of excess accumulation. The courts have talked about two to three times the prior year or three-year prior year average. In this instance, the range was 0.18, which is basically a school district having almost no cash in its educational fund for its operational purposes, to 1.57, well below the two bottom end threshold number. In most of these districts, it wasn't even one. We've listed the expenditure multipliers in each case. And at no time during the adjudication of the joint motion for summary judgment brought by the county and the school districts did the objectors ever question the methodology. They never raised any legal issues with respect to the propriety of this way of following your roadmap. They never raised any genuine issues of material fact. In a sense, they never objected to the joint motion for summary judgment. Now, maybe it gets down to whether or not the roadmap was correct. Well, your roadmap, Your Honor, was really indicative of decades of Illinois law showing that it is not just a matter of showing that a fund transfer is improper. There must be a showing of actual injury. And the excess accumulation calculation has become essentially a proxy, a way to measure injury for a taxpayer and a rate objector. If there's no excess accumulation, there is no injury. And that's what this Court said. Go back and do that well-settled analysis. CIPS v. Miller, this Court's decision in the Anderson case, this Court's decision in Allegis, you understand the excess accumulation analysis and you directed the parties to go back and do it. And that's what Judge Fullerton did. So you've seen all the briefs, but there are four points I'd like the Court to think about as you weigh this case. One is the political and legislative context in which these school districts operate and these objections were made. What is the ultimate issue for the Court here? The objector's, quote, hypothetical issue and then the role of tax rate objectors. Now, let's keep in mind that beginning in 1991, the DuPage County school districts became subject to what is known as the tax cap, the property tax extension limitation law, meaning they were unable to levy greater than the lesser of 5% or the increase in the CPI. And for each of the years at issue, it wasn't 5%. It was the CPI factor that was used in their limiting rate calculation. Additionally, since 1989, each of these districts has been subject to the truth in taxation law, meaning any time they want to approve, a school board wants to approve a levy greater than 5% of last year's levy, they have to post notice in a newspaper, welcome comments, give a phone number, a contact person, have a public hearing separate and apart from their regular or special board meeting, and take public comments. So at that level, there's significant scrutiny both statutorily by the tax extension office and by the public in addressing the folks they've elected to serve on the school board to do things like help administer the school district and approve budgets and levies. Another thing, and this is not directly in front of the Court, but it's an issue this Court can and should consider, is in 2010, the General Assembly approved an amendment to the Working Cash Article saying the types of transfers here are authorized and they don't have to go to the educational fund. They can go to the fund most in need of that particular school district. And the Wogenbach Court, if you look at the third paragraph from the end of that opinion, says, quote, that a court may appropriately consider the legislative action taken subsequent to the filing of the opinion of the appellate court, close quote. The legislature acted subsequent to the filing of the opinion of the appellate court. That is a reflection of the intent of the General Assembly with respect to these types of objections. Well, what's the intent? Because when the legislature acts in such a manner, there's two potential issues. One is it's changing the law as it previously existed, or two, it's reflecting what it believed the law was. And in this instance, Judge, I think it's a fair conclusion that it's reflecting what the law was because that section actually says any prior transfers made are validated or ratified by this particular section. So again, we're not here on 20-10, but certainly this court can consider what the intent of the General Assembly was. Another section you should be aware of is in 2003, the General Assembly in Section 17-2A permitted wide latitude to school districts to transfer funds between transportation, OM, and the educational fund. Again, what you're seeing is a trend by the General Assembly limiting the ability of school districts from a dollar sense but also giving them some flexibility given the property tax extension limitation law and its circumscribing of their actions and the truth in taxation law. What you find between the excess accumulation factors and the sort of structure of the law is you've got a group of school districts that, as a practical matter, are operating very leanly. You've got factors in their educational fund that are close to zero for some of these districts, and the vast majority, it's less than one. Now, the ultimate issue for this court, my second point, is the validity of the levies. If you look at the objections, there are objections to the educational funds. That is what's being objected to, whether there was an excessive amount of taxation in the educational funds. The accumulation analysis deals with whether or not a fund had too much in it, and the burden is on the objectors to show that they've been injured by this alleged over-levy in the educational fund. And 50 years of Illinois law says that they simply haven't when you do the CIPS v. Miller analysis. Objectors refer repeatedly to what they call a hypothetical issue. Now, frankly, there's nothing hypothetical about the issue that Judge Fullerton ruled on. He ruled on the issue that you directed him to rule on. You said to the trial court, do the excess accumulation analysis. It was done. No one objected to the conclusions of the excess accumulation analysis. There's been no abuse of discretion by these school districts if you look at settled Illinois law on what types of fund balances are appropriate here. And finally, the role of the rate objector. The rate objectors in Illinois, their role is not to micromanage the finance and daily operations of Illinois school districts. Courts have historically throughout the state afforded local taxing bodies great discretion to manage their daily financial matters and in estimating the amounts necessary to carry out their objectives. It's only when that discretion has been abused that the courts have intervened and sustained rate objections. Now, in this instance, there is nothing illegal about the educational levies of any of these districts. That was what is objected to, the educational fund levy. The analysis, and it's uncontroverted, is there's been no abuse of discretion by these school districts with respect to their educational fund levies. Counsel, it seems to me that I thought I heard something to the effect that the appellant was claiming that the basis for relief was illegal diversion. And in that regard, illegal diversion related to either questionable diversion to the educational fund or illegal diversion to an unauthorized by statute fund. So, how is it, please explain to me why the argument that the appellant is making is erroneous or lacks merit. When they talk about illegal diversion and you talk about excess accumulation in an education fund, when if there is illegal diversion to some fund other than the education fund, it would seem that what you're talking about is an irrelevancy. Well, Your Honor, the objections themselves are alleging that there was an excess of taxation in the educational fund. Had these fund transfers been to the educational fund rather than O&M, capital projects, fire, life safety, prevention funds, the districts would not have needed to levy the amounts they did in the educational fund. Counsel, I think that maybe the disposition that I authored might have said what you're saying. But I thought I heard a different argument today during oral argument in the briefs by the appellant. So what you're arguing to this panel doesn't seem to comport with what I believe the appellant is arguing. What you're stating is what the disposition suggested, which albeit it may be the law of the case, I was asking you for commentary on what the appellant is arguing, not on what the law of the case is. Well, Judge, we do not accept what the appellant is arguing because calling it, you called it an improper fund transfer. They call it an illegal diversion. It really doesn't matter what you call it, I would submit. What matters is what are the consequences or the effect. This Court said it was an improper fund transfer. So what we want you to do is take the funds that went into some other fund, put them in the educational fund, and do the analysis. Let's see if too much has been levied and accumulated in the educational fund. And the answer is it has not. So I think, Justice McLaren, that no matter the nomenclature one applies to it, you land in the same place. Well, you earlier argued that there has to be an injury, and then you talk about effect. Are they one and the same, or is there a distinction between the two? Well, I think that there has to be an injury. That's always been the case with Illinois law. Abraham Lincoln used to argue tax rate objections for the Illinois Central Railroad, and an injury was required, Judge. It simply is not a function of saying, gotcha, on that particular activity by a school board. So it's not just the effect. It's whether or not the effect resulted in an injury. That is correct, Your Honor, yes. I'm not attempting to squelch your argument. No, no, I've actually said everything I wanted to say, so if there are no further questions. Thank you all. I do have one question. You heard my question regarding whether or not we – what was the point in sending it back? Do you agree that we have the authority to grant the relief if we determine that the appellant's argument has merit? Or should we send it back for further factual findings or whatever? Well, first of all, Your Honor, we believe that Judge Fullerton correctly ruled on this case, and it deals with the entirety of what is called Objection A in the rate objections. That's the objection to the educational fund. And there would be no basis to overturn what you ruled on several years ago with respect to the GIS-1 decision. So that would be our position here. And we believe the roadmap has been followed and the ultimate conclusion on the roadmap has been ruled upon. There's nothing else to decide that is in front of this Court today, which is the propriety of Judge Fullerton's ruling on the excess accumulation argument. Thank you. Thank you, Counsel. Mr. Karras, your final argument?  Let me start off with a question. Counsel talked about liability being established in GIS-1. Yes, Your Honor. But Miller and its progeny have established that the level of damages or injury, which of course must be present, there must be some injury or some damages, and that measure of that is established by Miller excess accumulation. Do you agree with that? I agree that that's an accurate statement of Miller. I agree that GIS-1 established liability. I do not agree, and it is not the law, that that's the test of an illegal diversion and that that is the only remedy available. The illegal diversion remedies, although they have typically been addressed in an excess accumulation case, Justice Morgan, are the reduction in the following year's levy. That's what should have happened here. Was Anderson an illegal diversion case? Anderson was an illegal diversion case. Was it wrongly decided? No, Anderson adopted People X. Rel. Leaf v. Roth and held that the deprivation of money to the public was an injury, and it was wrong, and it needed to be returned. If you read People X. Rel. Leaf v. Roth, 389 Illinois 287, which Anderson adopted, this Court adopted, it clearly says that it is against the policy of the state to allow a taxing district to deprive the public of money for long periods of time. In this instance, Judge, it's $107 million over 10-plus years. Now, had that money been properly transferred to the Ed Fund, in the year following that transfer, that levy of the Ed Fund could have been reduced by the amount that was illegally diverted. They haven't done that. Even after this Court told them that what they did was condemned, they haven't changed. They're still diverting the money. You've heard now that they want to make a new argument that somehow curative legislation should be applied retroactively as opposed to prospectively. That's not our word in the statute that suggests that it should be applied retroactively. I don't think that's what—I mean, I don't get that argument. The argument was just pointing out that it has changed, and it may show the intent of the legislature as to what the law was previously, but not that we should apply that statute retroactively. I don't get that in the argument. Then I won't argue it further, Judge. The position here, Mr. Justice Lerk, panel, is that at the time that this issue arose, at the time that my predecessors drafted these objections, and today as we draft them, we're mindful of the fact that the statute provides the framework by which the districts have to live. Mr. Dalyos makes much of the fact that Peto came in and they were constrained. Well, they weren't too very constrained because they managed every year to divert the money, which set them apart from anything else. If you just add 1 plus 1, 2 suggests that they took money that they were not entitled to take and applied it in excess of Peto. So they got around Peto through this diversion. At the time of these objections, the only permanent transfer allowed by statute was abolishment, and the only fund entitled to receive an abolishment was the Ed Fund. Hence, the proper objection was to the Ed Fund because the Ed Fund didn't receive the money, the funds weren't abolished, and this was just a scheme to enhance other funds that otherwise weren't eligible to receive the money. It was an illegal diversion specifically done to avoid the need for a referendum, which is what would have had to have been done if they had abolished the Working Cash Fund. It was a specific scheme to avoid the statute that was clear on its face, and without regard for the argument that case law has been settled for 50 or 60 years, it doesn't address the fact that there's an illegal diversion here. These acts were, take the money from one fund, put it in another fund, we don't have authority to do it, there's no harm. Why is there no harm? Because we want you to understand that the only way for you to address this is excess accumulation. That's just, as this Court said previously, sophistry. It wasn't the objection. It's the illegal nature of what happened here. It's the deprivation of the public's money for extended periods of time, and that's a harm. And the remedy for that harm should have been, as Harding and Myers found, putting the money back into the fund for the following year, which reduced the need for the levy the following year. So you're saying that the roadmap that the prior disposition created wasn't followed by the trial court, as opposed to saying that the law of the case contained in the prior disposition was incorrect and we should be doing what you are now arguing? Yes. And unless there are further questions, I'm prepared to yield. Thank you, panel, for your time. We appreciate it. The panel would like to thank the attorneys for their arguments today. The case will be taken under advisement, I think, shortly.